## NEW YORK TRAP ROCK CORPORATION v. CHRISTIE SCOW CORPORA-TION et al.

### No. 17412.

District Court, E. D. New York.

Aug. 2, 1946.

Hagen & Eidenbach, of New York City (Henry Eidenbach and Neal J. Johnson, both of New York City, of counsel), for libellant.

Foley & Martin, of New York City (Christopher Heckman, of New York City, of counsel), for Christie Scow Corporation.

Burlingham, Veeder, Clark & Hupper, of New York City (Stanley R. Wright, of New York City, of counsel), for Moran Towing Corporation.

Macklin, Brown, Lenahan & Speer, of New York City (Gerald McKernan, of New York City, of counsel), for A. & A. Stevedoring Corporation.

Macklin, Brown, Lenahan & Speer, of New York City (R. F. Lenahan, of New York City, of counsel), for Tug Metropolitan No. 1.

Gerald McAllister, of New York City, for McAllister Lighterage Line.

INCH, District Judge.

This is a suit in the Admiralty. The libellant, New York Trap Rock Corporation owns the scow Theo Tallaksen, and chartered her to the respondent, Christie Scow Corporation during the period from December 30, 1944 to February 22, 1945.

The scow, while seaworthy and under the above charter, was sunk twice, first, on the night of January 24, 1945, at the foot of 54th Street, Brooklyn, and then, after having been raised, she sank a second time on February 18, 1945, while in tow of the tug Metropolitan No. 1. This second sinking involved parties other than those con-

cerned with the first, with the exception that at all times during these sinkings, the scow was under charter to the Christie Scow Corporation.

Accordingly, the circumstances surrounding both sinkings were properly shown in this single suit by libellant against the charterer. The latter impleaded the various parties alleged to be responsible for each of the sinkings and a single decree will dispose of the case. The extent of the damage caused by each sinking is a matter for the commissioner, as libellant is entitled to a decree.

I find that the scow when chartered was seaworthy and in good condition and was returned in a damaged condition not due to ordinary wear and tear. It is necessary therefore to take the circumstances surrounding, and the various respondents involved, in each sinking, as if these were separate causes of action. The first sinking is the most important. I refer to the sinking on January 24, 1945, at the foot of 54th Street, Brooklyn.

For convenience, I shall hereafter refer to the impleaded respondents as follows: The first sinking, Moran Towing Corporation as, Moran. A. & A. Stevedoring Company as, Stevedore. The second sinking, McAllister Lighterage Line, Inc., charterer of the tug, as, McAllister. Metropolitan No. 1 as, the tug. As to both sinkings, the charterer, Christie Scow Corporation as, Christie.

The charter of libellant with Christie was the usual charter, for an indefinite term at an agreed rate of hire. Christie, in turn, entered into an arrangement with Moran, about which there is considerable discussion in the briefs between Christie and Moran, but which it is unnecessary here to construe in definite terms, it being plain enough that Moran would be liable if negligent in failing to use reasonable care to place the scow or leave her in a berth reasonably safe.

Accordingly, the issue narrows down to whether Moran or the Stevedore, either or both, were negligent in causing the first sinking. A brief summary of the facts found by me is as follows:

On January 23, 1945, the scow was towed, by orders of Moran, to the foot of 54th Street, Brooklyn, and placed alongside a steamship which was there moored on the north side of the pier. This pier is approximately 573 feet long. The pier to the north at the foot of 53rd Street, is 199 feet long. The slip between these two piers was approximately 100 feet wide. This slip was exposed to a northwesterly wind. When the scow arrived alongside the steamer it was first placed, bow in, abreast of the No. 4 hatch, on the port side of the steamer, as she also lay bow in. The Stevedore thereupon began unloading, from the steamer, sand and gravel ballast. After about 200 tons had been taken from the steamer and loaded on the scow, starting at the middle and working aft, and about 3 o'clock or so in the afternoon, further loading was suspended as the weather was bad, being quite windy, with rough seas in the slip. The next morning the scow was moved further alongside of the steamer to hatches 2 and 3 and some more ballast was unloaded, but by early afternoon the storm became so severe that no work could be done and thereupon repeated notice was given to Moran, and to Christie, who in turn notified Moran, that the scow should be taken out of this berth as it was "plainly dangerous" and "will cause her to sink". Nothing was done by Moran and the scow did sink the night of the 24th.

The weather was bad enough on the 23rd, and there is evidence showing that Moran should have realized that the scow was berthed in a dangerously exposed berth in case of a northwest storm, which would naturally cause heavy swells in the slip.

To be sure, when this weather condition, evident on January 23rd, finally built up to its greatest intensity late in the day of January 24th, it may have been too late, because of the storm and the freezing temperature, to save the scow and possibly this fact is now relied on by Moran to exculpate itself from a situation caused by the failure to previously exercise reasonable care for the safety of the scow.

The testimony of the various witnesses requires careful consideration as to the dates of occurrence, but certain facts ap-

pear and these, in my opinion, relate to what took place prior to the night of the 24th, when the scow was sunk by the storm. In my opinion, the Stevedore did everything possible to prevent the loss of the scow. I find nothing wrong in the loading of the scow and in fact employees of the Stevedore risked the life of one of their number in an attempt to replace the hatch cover of a small hatch in the stern of the scow, which the severe storm and waves had removed.

■ Accordingly, the petition should be dismissed as to the Stevedore. But a different situation exists as to Moran. The location and possible danger of this berth for the scow was known to Moran, or reasonably should have been. Likewise, was the condition of the weather.

When the Moran tug placed the scow alongside the steamship, it should have placed her bow out instead of leaving her stern to face the open slip. Both the scow captain and the scow captain of another barge state this fact, for the reason that the scow is higher at the bow than at the stern, and the usual loading of the scow followed by the Stevedore started at the middle and worked aft. Even if this was not so originally, although I think it was, reasonable care would have indicated that the tug, as Nicholson testified, "could have towed him (scow) to the end (of the slip) and turned around".

However, if this placing of the scow, stern out, would not be considered negligent, it was negligence on the part of Moran not only to place her, as he did, in this exposed slip under the prevailing weather conditions, but the following afternoon he was repeatedly notified of the increasing danger to the scow and apparently did nothing during all this time when something could have been done to rescue the scow from her danger.

Witnesses testified that these notices were given to Moran on several occasions from 3 o'clock in the afternoon until 5:30 and during those hours, witnesses testified, that the scow was still "in good condition" (Anastasia) "up to 4 o'clock it was very easy to take the scow away. I have seen the weather rougher than that". "The

scow was all right when I left at 6 o'clock, a little bit down by the stern—about a foot. She still had a couple of feet of freeboard". (Susino).

■ It was, therefore, in my opinion, the failure to use reasonable care on the part of Moran to leave this scow, under all the above circumstances, to the mercy of the storm that finally sank her, where reasonable opportunities presented themselves either to have avoided on January 23rd, this unfortunate sinking, or during the afternoon of January 24th.

Libellant, therefore, is entitled to a decree primarily against Moran and secondarily against Christie.

■ We now come to the second sinking. Christie has impleaded McAllister, the charterer of the tug, and the tug that did the towing. The burden of proof to show negligence rests upon libellant and it is the duty of the charterer to explain the circumstances surrounding this second sinking of the scow.

Accordingly, it appears that Christie arranged with the Merritt-Chapman & Scott Company to have the scow raised and directed that she be towed to the Union Dry Dock at Weehawken, North River. On February 17 and 18, the Merritt-Chapman & Scott Company raised the scow in slings, pumped her out as far as its pumps would do so, and McAllister, at the request of Christie, then sent the tug to tow the unfortunate scow to the Union Dry Dock. It was cold weather and there was some floating ice in the river. Christie argues that the tug captain negligently towed the scow through the broken ice causing a hole to be made in her bow, whereupon she again sank. I do not find any evidence sufficient to sustain this charge. On the contrary, in my opinion, the witness relied on by Christie to support this claim, lacks the credibility necessary. I prefer to believe Heklund, captain of the tug.

It must be remembered that the scow had gone through the raising by slings, with part of her cargo of sand and gravel on board, and she is referred to by a witness of the Merritt-Chapman & Scott Company as the "wreck" and that while she would float, this same witness indicated that rea-

sonable care would require that she still be pumped on her voyage to the dry dock, and in fact Christie sent its representative to do that very thing on the trip, and at Christie's order, he installed a small gasoline pump. This witness for Christie who was then in charge of the scow, also asserts that it was wrong for the tug to take her alongside instead of towing her.

While the weather "wasn't bad" it was plainly quite cold, and Captain Heklund testified, that he told this representative that he intended to take her by a hawser and that he asked if this representative of Christie was to "ride" the scow? That this representative replied, "I have got to watch the pump. If you tow her on a hawser I am going to walk ashore". Accordingly, the tug captain assented to taking the scow alongside, on the port side, of the tug. She was longer than the tug, but the captain of the tug had a good view of what would take place on the trip so far as ice, etc., was concerned.

Whereupon the tug and tow started out and the pump was working as they went up the North River. When they got about opposite 18th Street, the captain noticed that the pump had stopped. The representative of Christie very naturally preferred the warmth of the galley of the tug and it was the captain of the tug that noticed that the pump had stopped and he blew a signal to his deckhand and told him "to get in touch with the man in the kitchen to look after his pump". This was done and it was "reported to me that the pump had stopped because it had run short of gasoline".

To be sure, this representative of Christie denies there was any shortage of gasoline, that he had a five gallon can of it aboard, half full, but the fact is that during the next hour or so, there is no evidence that the pump resumed work. As a result, the scow gradually leaked and by the time that the dry dock had been reached she was in such a condition that they would not allow her to be brought in to the dry dock and she was taken to a nearby mud bottom and there placed, from which she slipped and again sank. This seems to me to be the reasonable explanation for the second sinking rather than the effort on the part of the representative of Christie, that she was driven into the ice carelessly by the captain of the tug, an explanation which seems to me to be incredible.

While the damages sustained, if any, by the scow on this second sinking so far as the extent thereof is concerned, will be for the commissioner, and I do not mean to infer that there was not some damage, in my opinion, so far as this trial is concerned, such damage must have been slight. However this may be, I think the cause of this second sinking was due entirely to the negligence of the representative of Christie in neglecting to continue to pump out the scow, which apparently otherwise would have reached its destination. This being so, the McAllister and the tug are exonerated and libellant is entitled to a decree for such damages as may be found against Christie.

Only one decree, it seems to me, is required covering the entire suit. See, Oneida Nav. Corporation v. W. & S. Job & Co., 252 U.S. 521, 40 S.Ct. 357, 64 L.Ed. 697; Catlin v. United States, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911.

Submit findings of fact and conclusions of law.